## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND-ODESSA DIVISION

| | |
|---|---|
| ADVANCED CLUSTER SYSTEMS, INC., | |
| Plaintiff, | Civil Action No. 7:24-CV-00245 |
| v. | **JURY TRIAL DEMANDED** |
| INTEL CORPORATION, | |
| Defendant. | |

## COMPLAINT

Plaintiff Advanced Cluster Systems, Inc. ("ACS"), by and through its undersigned counsel, hereby complains of Defendant Intel Corporation ("Intel"), and alleges as follows:

### NATURE OF THE ACTION

1.      This is a civil action for infringement of ACS's United States Patent Nos. 10,333,768, 11,563,621, 11,570,034, 11,811,582, and 12,021,679 (the "Patents-in-Suit") under the patent laws of the United States, 35 U.S.C. § 100, *et seq.*

### THE PARTIES

2.      Plaintiff ACS is a corporation incorporated under the laws of California and has its principal place of business at 220 Newport Center Drive, #11-202, Newport Beach, California 92660.

3.      On information and belief, Defendant Intel is a corporation duly organized and existing under the laws of the State of Delaware, having a regular and established place of business in the Western District of Texas, including at 1300 South Mopac Expressway, Austin, Texas

78746, and at 9442 Capital of Texas Hwy N, Bldg 2, Suite 600, Austin, Texas, 78759.[1]  Intel may

be served through its registered agent, The Corporation Trust Corporation, located at Corporation

Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

## JURISDICTION AND VENUE

4.      ACS asserts claims for patent infringement arising under the patent laws of the

United States, 35 U.S.C. § 100, *et seq.*  This Court has subject matter jurisdiction of these claims

under, *inter alia*, 28 U.S.C. §§ 1331 and 1338(a).

5.      Intel is subject to this Court's specific and general personal jurisdiction consistent

with the principles of due process and/or the Texas Long Arm Statute, TEX. CIV. PRAC. & REM.

CODE § 17.041 *et seq*.  This Court has general and specific personal jurisdiction over Intel at least

because Intel has committed acts within the State of Texas and the Western District of Texas giving

rise to this action, including, on information and belief, developing, making, using, marketing,

selling, offering for sale, importing into the United States, and/or testing the infringing products,

transacting and conducting business in the State of Texas and in the Western District of Texas, and

transacting and conducting business with residents of the State of Texas and of the Western District

of Texas.

6.      ACS's causes of action arise, at least in part, from Intel's contacts with and

activities in and/or directed at this District and the State of Texas. Intel has systematic and

continuous business activities in this District. As described below, Intel has committed acts of

patent infringement giving rise to this action within this District.

---

[1] *See, e.g.*, https://www.intel.com/content/www/us/en/location/usa.html; https://www.intel.com/content/www/us/en/corporate-responsibility/intel-in-texas.html ("Intel is proud to call Texas home….") (all web pages cited herein and in the accompanying charts were last visited on or about September 23, 2024).

7.      Personal jurisdiction exists generally over Intel because Intel has sufficient minimum contacts with the forum as a result of business conducted within the State of Texas and the Western District of Texas and/or has engaged in continuous and systematic activities in the Western District of Texas, and Intel is registered with the Secretary of State to do business in the State of Texas. Personal jurisdiction also exists over Intel because it makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products or processes within the State of Texas and the Western District of Texas that infringe one or more claims of the Patents-in-Suit, as alleged more particularly below.

8.      For example, as alleged more particularly below, Intel has infringed and continues to infringe the Patents-in-Suit within the State of Texas and the Western District of Texas by making, using, selling, licensing, offering for sale, and/or importing or exporting in, into, or out of the Western District of Texas and elsewhere in the State of Texas, products and services covered by claims in the Patents-in-Suit, including without limitation products that, when made or used, practice the claimed methods and systems of the Patents-in-Suit.  Intel, directly and through intermediaries, makes, uses, sells, offers for sale, imports, ships, distributes, advertises, promotes, and/or otherwise commercializes such infringing products and services in or into the Western District of Texas and the State of Texas.  Intel regularly conducts and solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from goods and services provided to residents of the Western District of Texas and the State of Texas.

9.      Venue in this District is proper under 28 U.S.C. §§ 1400(b) and 1391(b) and (c) because Intel is subject to personal jurisdiction in the Western District of Texas and has committed acts of infringement in the Western District of Texas, either directly or through respective agents. Intel makes, uses, sells, and/or offers to sell infringing products or processes within the Western

District of Texas, has a continuing presence within the Western District of Texas, and has the requisite minimum contacts with the Western District of Texas such that this venue is a fair and reasonable one. Upon information and belief, Intel has transacted, and at the time of the filing of this Complaint, is continuing to transact business within the Western District of Texas.

10.     Intel has regular and established places of business in the Western District of Texas, including at 1300 South Mopac Expressway, Austin, Texas 78746, and at 9442 Capital of Texas Hwy N, Bldg 2, Suite 600, Austin, Texas, 78759.

11.     On information and belief, Intel makes, uses, sells, tests, offers to sell, and/or imports infringing products into and/or within the Western District of Texas, including at its Austin locations.  Intel maintains a permanent and/or continuing presence within the Western District of Texas at its Austin locations, and has the requisite minimum contacts with the Western District of Texas such that this venue is a fair and reasonable one. Upon information and belief, Intel has transacted and, at the time of the filing of this Complaint, is continuing to transact business within the Western District of Texas.

12.     Intel purposefully directs or controls the sale of the Accused Products, including, on information and belief, for sale in Texas and elsewhere in the United States, and expects and intends that the Accused Products will be so sold in the Western District of Texas. Intel purposefully places the Accused Products—whether by itself or through subsidiaries, affiliates, or third parties—into an international supply chain, knowing that the Accused Products will be sold in the United States, including in Texas and in the Western District of Texas. Therefore, Intel also facilitates the sale of the Accused Products in Texas.  On information and belief, Intel is aware that Texas is a termination point of its established distribution channels for the Accused Products.

13.    On information and belief, current Intel employees with knowledge relevant to the claims in this case are located in the Western District of Texas and within the State of Texas. For example, searches of LinkedIn® reveal over 2700 individuals located in Texas that, on information and belief, list Intel Corporation as their current employer. Further searches reveal over 140 current employees of Intel who, on information and belief, list job titles or job experience related to Xeon Scalable Processors, which are among the Accused Products. Exemplary current Intel employees located in Austin, TX that, on information and belief, have information relevant to the Accused Products include: (1) Younghyun Kim,[2] Director, Product and Test Engineering, who lists experience managing global product and test engineering teams in US, Malaysia, India, China, and Ireland and leading manufacturing and product development for IPU and Custom ASIC/Server products; (2) Allan Munoz,[3] Sr. Director Xeon Validation; (3) Shireen Bacon,[4] Associate General Counsel, Director of Patents - CPU Architecture, Security, & Power Management; (4) Nick Stasik,[5] Vice President Design Engineering Group, E-core CPU Development in Austin, TX and former E-core Silicon Design Manager in Hillsboro, Or; (5) Fernando Ambriz Meza,[6] current Director of Engineering – Xeon Server UEFI Firmware Director and former Senior Software Engineering Manager - Xeon SP and SoC Servers UEFI Firmware Development Manager; (6) Adil Sarwar,[7] Group Product Manager, Computer Infrastructure who lists experience as Leader of Compute Infrastructure product definition, roadmap, vision and design decisions for IA Core™ and Xeon™ product line; (7) John Humphreys,[8] current AI Platform Architect and former Senior

---

[2] *See* https://www.linkedin.com/in/erogen/.
[3] *See* https://www.linkedin.com/in/allan-mu%C3%B1oz-35678428/.
[4] *See* https://www.linkedin.com/in/shireenbacon/.
[5] *See* https://www.linkedin.com/in/nickstasik/.
[6] *See* https://www.linkedin.com/in/fambriz.
[7] *See* https://www.linkedin.com/in/adilsarwar.
[8] *See* https://www.linkedin.com/in/john-humphreys-524a0939.

AI SRE/DevOps Engineer (Team Lead) responsible for AI platform design and automation of the entire AI HPC network, hardware, and software stack leveraging Xeon, Gaudi 1, Gaudi 2, and Gaudi 3 based technology; and (8) David Goldberg,[9] Sr. Manager AI Cluster Engineering, who lists experience launching an at scale Habana AI Training cluster for public preview of Intel Gaudi 2 accelerators. Further research and discovery may produce additional current Intel employees with information relevant to the Accused Products and infringement of the Asserted Patents, but the above results show substantial numbers of current Intel employees with knowledge relevant to the claims in this case are located in the Western District of Texas and within the State of Texas.

14.     On information and belief, former Intel employees with knowledge relevant to the claims in this case are located in the Western District of Texas and within the State of Texas. For example, searches of LinkedIn® reveal over 8900 individuals located in Texas who, on information and belief, list Intel as a past employer. Additional LinkedIn® searches reveal over 300 past employees of Intel located in Texas who, on information and belief, list job titles or job experience related to Xeon processors, which are among the Accused Products. Exemplary former Intel employees located in Austin, TX that, on information and belief, have information relevant to the Accused Products include: (1) Edward Torres,[10] who now is at AMD, but was previously at Intel as Sr. Director of Xeon Functional Validation & Debug (Austin/Guadalajara Sites) – 10/2022 – 3/2024, Sr. Director of Xeon Functional Validation & Debug (Austin Site) – 4/2019 – 10/2022, and Principal Engineer – Xeon Validation – 9/2018 – 4/2019; (2) Byron Sonner,[11] who now is at AMD, but was previously at Intel as Sr. Director Server System Validation Engineering (Austin) – 12/2020 – 5/2022, Functional Validation Engineering (Austin) – 4/2019 – 12/2020, and

---

[9] *See* https://www.linkedin.com/in/davidagoldberg.
[10] *See* https://www.linkedin.com/in/edwardtorres.
[11] *See* https://www.linkedin.com/in/byron-sonner.

Validation Chief Engineer and Engineering Manager – 6/2017 – 4/2019; (3) Maria Cristina Landivar,[12] who now is at AMD, but was previously at Intel as Engineering Manager – 12/2018 – 7/2021 with experience as Engineering Manager and Lead for the Power, Thermal, and Performance Xeon Product Validation Team for Intel Datacenter Products and as System Validation Engineer – 12/2015 – 12/2018 with experience for Power and Performance Validation Engineer for Intel Servers under the Power Thermal and Performance Validation Engineering team; (4) Vardhan LJV Badukonda,[13] now at Microsoft, but was previously at Intel as Engineering Manager – Post Silicon Functional Validation for Xeon Servers – Accelerators Stack– 5/2021 – 1/2023; and (5) Deepak Ramachandran,[14] who now is at AMD, Austin, TX, but was previously at Intel as Product leader – Intel Xeon Scalable processors and platforms, Data Center Product Marketing (Portland, OR) – 2017 – 2018. Further research and discovery may produce additional current Intel employees with information relevant to the Accused Products and infringement of the Asserted Patents, but the above results show substantial numbers of former Intel employees with knowledge relevant to the claims in this case are located in the Western District of Texas and within the State of Texas

15.     For at least the above reasons, venue is appropriate and convenient in the Western District of Texas.  ACS reserves the right to amend or supplement its initial contentions regarding jurisdiction and venue as set forth herein, based upon further discovery.

**THE PATENTS-IN-SUIT**

16.     ACS realleges and reincorporates by reference the allegations set forth in paragraphs 1-15 of this complaint.

---

[12] *See* https://www.linkedin.com/in/maria-cristina-landivar-66868272.
[13] *See* https://www.linkedin.com/in/vardhan-badukonda.
[14] *See* https://www.linkedin.com/in/deepak-ramachandran-5236ab2.

17.     United States Patent No. 10,333,768, titled "Cluster Computing" ("the '768 patent"), is a valid, enforceable patent that the United States Patent and Trademark Office duly and lawfully issued on June 25, 2019, in full compliance with Title 35 of the United States Code. A true and correct copy of the '768 patent is attached to this complaint as Exhibit A.

18.     ACS is the assignee of the '768 patent with ownership of all substantial rights in the '768 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

19.     The claims of the '768 patent when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components at the time of invention.

20.     United States Patent No. 11,563,621, titled "Cluster Computing" ("the '621 patent"), is a valid, enforceable patent that the United States Patent and Trademark Office duly and lawfully issued on January 24, 2023, in full compliance with Title 35 of the United States Code.  A true and correct copy of the '621 patent is attached to this complaint as Exhibit B.

21.     ACS is the assignee of the '621 patent with ownership of all substantial rights in the '621 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

22.     The claims of the '621 patent when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components at the time of invention.

23.     United States Patent No. 11,570,034, titled "Cluster Computing" ("the '034 patent"), is a valid, enforceable patent that the United States Patent and Trademark Office duly

and lawfully issued on January 31, 2023, in full compliance with Title 35 of the United States Code. A true and correct copy of the '034 patent is attached to this complaint as Exhibit C.

24.    ACS is the assignee of the '034 patent with ownership of all substantial rights in the '034 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

25.    The claims of the '034 patent when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components at the time of invention.

26.    United States Patent No. 11,811,582, titled "Cluster Computing" ("the '582 patent"), is a valid, enforceable patent that the United States Patent and Trademark Office duly and lawfully issued on November 7, 2023, in full compliance with Title 35 of the United States Code. A true and correct copy of the '582 patent is attached to this complaint as Exhibit D.

27.    ACS is the assignee of the '582 patent with ownership of all substantial rights in the '582 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

28.    The claims of the '582 patent when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components at the time of invention.

29.    United States Patent No. 12,021,679, titled "Cluster Computing" ("the '679 patent"), is a valid, enforceable patent that the United States Patent and Trademark Office duly and lawfully issued on June 25, 2024, in full compliance with Title 35 of the United States Code. A true and correct copy of the '679 patent is attached to this complaint as Exhibit E.

30.    ACS is the assignee of the '679 patent with ownership of all substantial rights in the '679 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

31.    The claims of the '679 patent when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components at the time of invention.

32.    ACS has complied with the marking requirements of 35 U.S.C. § 287(a), and therefore is entitled to past damages.

33.    Computer clusters include a group of two or more computers, microprocessors, and or processor cores ("nodes") that intercommunicate so that the nodes can accomplish a task as though they were a single computer.  Prior to the inventions disclosed and claimed in the Patents-in-Suit, most software application programs were unable to benefit from the advantages offered by cluster computing, even if running on a group of computers that could act as a cluster.   This is because the software application programs were not designed to benefit from the advantages offered by computer clusters.  For example, many software application programs were coded to perform tasks serially, were designed to recognize and send instructions to only a single node in a cluster, or included a kernel that was designed to communicate with a single node.  Wolfram Research Mathematica® is an example of a software application program with a kernel that was designed to communicate with a single node.

34.    Prior to the inventions disclosed and claimed in the Patents-in-Suit, one method used to improve the performance of software application programs with a kernel designed to communicate with a single node was to utilize a form of distributed computing called grid computing.  Grid computing included a plurality of computer nodes that did not communicate with

one another as peers.  One node served as a master node that managed a plurality of slave nodes. Each slave node functioned independently, and intermediate results of one slave node did not affect other jobs in progress on other nodes. Slave nodes communicated only with the master node, and not directly with other slave nodes. An example of grid computing applied to a software application program with a kernel designed to communicate with a single node was Wolfram Research gridMathematica.  Distributed computing architectures like grid computing could be optimized only for workloads that consisted of many independent jobs of packets of work that did not need to share data between the jobs during the computational process.

35.    The Patents-in-Suit are directed to an advanced, parallel mesh computing framework that makes supercomputing performance available to mainstream software.  The disclosed inventions enable software application programs to benefit from the advantages offered by computer clusters by, amongst other things, providing systems and methods for allowing cluster nodes to directly communicate with one another, and not just to a master node, via a communications network to perform calculations and processing on a larger scale and/or with improved speed.

## FACTUAL BACKGROUND

36.    ACS realleges and reincorporates by references the allegations set forth in paragraphs 1-35 of this Complaint.

37.    Plaintiff ACS was founded in 2004 by Zvi Tannenbaum.  Mr. Tannenbaum has a degree in electronics from the Israeli Air Force Technical School in Haifa, Israel, and devoted over 27 years to the electronic test industry prior to forming ACS.  Mr. Tannenbaum's passion for supercomputers led him to create ACS in 2004, with the mission of building innovative parallel

programming tools for high-performance computing applications running on multicore, clusters, and supercomputers.

38.     To accomplish his mission, Mr. Tannenbaum partnered with Dr. Dean E. Dauger, Founder and President of Dauger Research, Inc.  Dr. Dauger is an accomplished scientist with extensive experience in high-performance computing.  He holds a B.S. in Mathematical Physics from Harvey Mudd College, an M.S. in Physics from the University of California, Los Angeles ("UCLA") and a Ph.D. in Physics, also from UCLA.  While at UCLA, Dr. Dauger co-invented the first easy-to-use, high-performance cluster using a network of Macintosh computers, which garnered worldwide recognition.

39.     Dr. Dauger has won multiple American Institute of Physics software contests, and he coauthored the original, award-winning Kai's Power Tools image-processing package for Adobe® Photoshop®.  Dr. Dauger has also authored articles published in a variety of journals including the IEEE Journal of Computing in Science and Engineering, Journal of Computational Physics, Journal of Computer Physics Communications, and IEEE International Conference on Cluster Computing.

40.     Through their partnership, Dr. Dauger and Mr. Tannenbaum developed groundbreaking systems and methods to improve parallel programming and supercomputing functionality, some of which were commercialized.

41.     For example, Dr. Dauger and Mr. Tannenbaum developed a Supercomputing Engine Technology™ (SET™) product.  SET is based on Message Passing Interface ("MPI") technology.  Thus, SET is an MPI-based library that significantly simplifies parallel programming and allows a wide range of software writers to scale their code efficiently on a multitude of cores. ACS began selling SET in 2010.

42.     During the development phase of SET, the SET parallelization approach was applied to Wolfram Research Mathematica, providing it with supercomputing-style parallelization.  The resulting product was commercialized as SEM™ (Supercomputing Engine for Mathematica).  SEM was a software add-on for use with Mathematica that created a standard way for each Mathematica kernel in a cluster to communicate directly with every other kernel.  In contrast to typical Mathematica grid implementations that were solely master-slave or server-client implementations, SEM enabled all kernels to communicate collectively.  ACS began selling SEM in 2008.  Enabling Mathematica kernels to be harnessed together in this manner was a new approach to handling supercomputing challenges at that time.

43.     Dr. Dauger and Mr. Tannenbaum's innovative systems and methods at issue in this action are described and claimed in the Patents-in-Suit.

44.     ACS is informed and believes, and thereon alleges that Intel was making, using, testing, selling, offering for sale, and/or importing into the United States commercial products incorporating its infringing technology at least as early as 2019.  For example, by June of 2019, Intel was making, using, testing, selling, offering for sale, and/or importing into the United States commercial products incorporating its infringing technology, including Intel Xeon Scalable Processors (Skylake-SP architecture).[15]

45.     As another example, by June of 2019, Habana Labs, Ltd. (a computer processor company now owned by Intel) was making, using, testing, selling, offering for sale, and/or importing into the United States commercial products incorporating its infringing technology,

---

[15] https://ark.intel.com/content/www/us/en/ark/products/series/125191/intel-xeon-scalable-processors.html.

including Gaudi, HL-200, HL-205, HLS-1, and Goya accelerators.[16]    Intel announced the acquisition of Habana Labs, Ltd. in December of 2019.[17]

46.    ACS is informed and believes, and thereon alleges that Intel subsequently began making, using, testing, selling, offering for sale, and/or importing into the United States additional products infringing, or especially adapted for infringing ACS's patented technology, including the 2nd Gen Intel Xeon Scalable Processors,[18] 3rd Gen Intel Xeon Scalable Processors,[19] 4th Gen Intel Xeon Scalable Processors,[20] 5th Gen Intel Xeon Scalable Processors[21], and Intel Xeon 6 Processors.[22]

47.    ACS is informed and believes, and thereon alleges that Intel has made, used, offered to sell, and/or sold within the United States, and/or has imported into the United States server and workstation products that utilize Intel's Habana AI accelerator architectures, including at least the Gaudi HLS-1 AI Training System,[23]  HLS-Gaudi2 server,[24] and Gaudi 3 AI Accelerator HLB-325 Baseboard[25] products, and all products including to related to those products, as well as any

---

[16] https://habana.ai/press/habana-labs-announces-gaudi-ai-training-processor/.
[17] https://download.intel.com/newsroom/2021/archive/2019-12-16-news-releases-intel-ai-acquisition.pdf.
[18] https://ark.intel.com/content/www/us/en/ark/products/series/192283/2nd-gen-intel-xeon-scalable-processors.html.
[19] https://ark.intel.com/content/www/us/en/ark/products/series/204098/3rd-gen-intel-xeon-scalable-processors.html.
[20] https://ark.intel.com/content/www/us/en/ark/products/series/228622/4th-gen-intel-xeon-scalable-processors.html.
[21] https://ark.intel.com/content/www/us/en/ark/products/series/236644/5th-gen-intel-xeon-scalable-processors.html.
[22] https://ark.intel.com/content/www/us/en/ark/products/series/240357/intel-xeon-6.html.
[23] https://www.intel.com/content/www/us/en/content-details/784787/gaudi-hls-1-ai-training-system.html.
[24] https://habana.ai/wp-content/uploads/2023/10/HLS-Gaudi2_Datasheet_10_23.pdf.
[25]  https://www.intel.com/content/www/us/en/content-details/817489/intel-gaudi-3-ai-accelerator-hlb-325-baseboard-product-brief.html.

products incorporating those items and any products that are substantially similar to those items (the "Accused Habana Server Products").

48.    ACS is informed and believes, and thereon alleges that Intel has made, used, offered to sell, and/or sold within the United States, and/or has imported into the United States AI accelerator products especially adapted for use in server and workstation products, including the Gaudi, Gaudi 2, Gaudi 3, and Goya AI accelerator products, as well as any products that are substantially similar to those items (the "Accused Habana AI Accelerator Products").

49.    ACS is informed and believes, and thereon alleges that Intel has made, used, offered to sell, and/or sold within the United States, and/or has imported into the United States the Xeon Scalable Processors (Skylake-SP architecture), 2nd Gen Intel Xeon Scalable Processors, 3rd Gen Intel Xeon Scalable Processors, 4th Gen Intel Xeon Scalable Processors, 5th Gen Intel Xeon Scalable Processors, and Intel Xeon 6 Processors, as well as any products incorporating those items, and any products that are substantially similar to those items (the "Accused Xeon Products").

50.    Collectively, the Accused Habana Server Products, Accused Habana AI Accelerator Products, and Accused Xeon Products are referred to herein as the Accused Products.

**FIRST CLAIM FOR RELIEF**
**INFRINGEMENT OF THE '768 PATENT**

51.    ACS realleges and reincorporates by references the allegations set forth in paragraphs 1-50 of this Complaint.

52.    ACS is informed and believes, and thereon alleges that Intel has directly infringed and continues to infringe, literally and/or through the doctrine of equivalents, at least one claim of the '768 patent by making, using, selling, offering for sale, and/or importing one or more of the

Accused Products, in violation of 35 U.S.C. § 271(a).  Intel continues to engage in acts of direct infringement of the '768 patent.

53.    Exhibit F1 provides a claim chart demonstrating how the Accused Habana Server Products and Accused Habana AI Accelerator Products practice claim 1 of the '768 patent.  Exhibit F2 provides a claim chart demonstrating how the Accused Xeon Products practice claim 1 of the '768 patent.  Exhibit F3 provides a claim chart demonstrating how the Accused Habana AI Accelerator Products are configured in a manner that practices claim 35 of the '768 patent.  Exhibit F4 provides a claim chart demonstrating how the Accused Xeon Products are configured in a manner that practices claim 35 of the '768 patent.

54.    Intel is aware of the '768 patent and the infringement of the '768 patent by the Accused Products at least as of the filing date of this Complaint.  To the extent that Intel continues to infringe the '768 patent after the filing of this Complaint, it does so in willful disregard of ACS's patent rights.  Intel's continued infringement of the '768 patent is deliberate and willful, entitling ACS to an award of treble damages, reasonable attorney fees, and costs in bringing this action.

55.    ACS is informed and believes, and thereon alleges that, at least as of the filing date of this Complaint, Intel has actively, knowingly, and intentionally induced infringement of at least claims 1 and 35 of the '768 patent in violation of 35 U.S.C. § 271(b).  ACS is informed and believes, and thereon alleges that Intel makes, uses, sells, offers for sale, and/or imports one or more of the Accused Products for or on behalf of third parties such as customers, users, system builders, partners, and retailers/distributors, knowing and intending that the Accused Products will be used by the third parties in a manner that practices at least claims 1 and 35 of the '768 patent as shown in Exhibits F1, F2, F3 and F4, respectively.  For example, Intel published and provided marketing materials, technical specifications, whitepapers, datasheets, user manuals, and

development and testing information, and other resources on its website (http://www.intel.com/) that instructed and encouraged third parties to integrate the Accused Products into products using Intel's technology that were then made, used, sold, offered for sale and/or imported into the United States.[26]   Intel has also established the "Intel AI Partner ecosystem" to assist customers with training, professional services, and service and support.[27]   These activities were designed to bring infringing products that incorporate Intel's Accused Products to market in the United States.  As a result of Intel's activities, the Accused  Products have been used in a manner that directly infringes the '768 patent.  Intel continues to engage in acts of inducement of infringement of the '768 patent.

56.   ACS is informed and believes, and thereon alleges that Intel has directly infringed literally and/or through the doctrine of equivalents claims 1 and 35 of the '768 patent by making, using, selling, offering for sale, and/or importing one or more of the Accused Products in violation of 35 U.S.C. § 271(a).

57.   As a consequence of Intel's infringement of the '768 patent, ACS has been damaged and is entitled to monetary relief in an amount to be determined at trial.

58.   Unless enjoined, Intel and/or others acting on behalf of Intel will continue their infringing acts, thereby causing additional irreparable injury to ACS for which there is no adequate remedy at law.

59.   ACS reserves the right to amend or supplement the initial infringement contentions set forth herein and in Exhibits F1, F2, F3, and F4, including the list of Accused Products, based

---

[26] *E.g.*, https://www.intel.com/content/www/us/en/products/details/processors/ai-accelerators/gaudi-overview.html; https://www.intel.com/content/www/us/en/products/docs/processors/xeon/xeon-scalable-platform-where-to-buy.html.

[27] *E.g.*,

https://www.intel.com/content/www/us/en/partner-alliance/membership/benefits/partners-ai.html.

upon further discovery. Further, ACS may amend or supplement any of its infringement contentions in view of any claim construction ruling(s) by the Court or any position taken by any party in this or any other related action. ACS therefore expressly reserves the right to amend or to supplement its identification of asserted claims and Accused Products, as well as its claim charts, based on further investigation and discovery.

**SECOND CLAIM FOR RELIEF**
**INFRINGEMENT OF THE '621 PATENT**

60.     ACS realleges and reincorporates by references the allegations set forth in paragraphs 1-50 of this Complaint.

61.     ACS is informed and believes, and thereon alleges that Intel has directly infringed and continues to infringe, literally and/or through the doctrine of equivalents, at least one claim of the '621 patent by making, using, selling, offering for sale, and/or importing one or more of the Accused Products, in violation of 35 U.S.C. § 271(a).  Intel continues to engage in acts of direct infringement of the '621 patent.

62.     Exhibit G1 provides a claim chart demonstrating how the Accused Habana Server Products and Accused Habana AI Accelerator Products practice claim 1 of the '621 patent.  Exhibit G2 provides a claim chart demonstrating how the Accused Xeon Products practice claim 1 of the '621 patent.

63.      Intel is aware of the '621 patent and the infringement of the '621 patent by the Accused Products at least as of the filing date of this Complaint.  To the extent that Intel continues to infringe the '621 patent after the filing of this Complaint, it does so in willful disregard of ACS's patent rights.  Intel's continued infringement of the '621 patent is deliberate and willful, entitling ACS to an award of treble damages, reasonable attorney fees, and costs in bringing this action.

64.    ACS is informed and believes, and thereon alleges that, at least as of the filing date of this Complaint, Intel has actively, knowingly, and intentionally induced infringement of at least claim 1 of the '621 patent in violation of 35 U.S.C. § 271(b).  ACS is informed and believes, and thereon alleges that Intel makes, uses, sells, offers for sale, and/or imports one or more of the Accused Products for or on behalf of third parties such as customers, users, system builders, partners, and retailers/distributors, knowing and intending that the Accused Products will be used by the third parties in a manner that practices at least claim 1 of the '621 patent as shown in Exhibits G1 and G2.  For example, Intel published and provided marketing materials, technical specifications, whitepapers, datasheets, user manuals, and development and testing information, and other resources on its website (http://www.intel.com/) that instructed and encouraged third parties to integrate the Accused Products into products using Intel's technology that were then made, used, sold, offered for sale and/or imported into the United States.[28]  Intel has also established the "Intel AI Partner ecosystem" to assist customers with training, professional services, and service and support.[29]  These activities were designed to bring infringing products that incorporate Intel's Accused Products to market in the United States.  As a result of Intel's activities, the Accused  Products have been used in a manner that directly infringes the '621 patent.  Intel continues to engage in acts of inducement of infringement of the '621 patent.

65.    ACS is informed and believes, and thereon alleges that Intel has directly infringed literally and/or through the doctrine of equivalents claim 1 of the '621 patent by making, using,

---

[28] *E.g.*, https://www.intel.com/content/www/us/en/products/details/processors/ai-accelerators/gaudi-overview.html; https://www.intel.com/content/www/us/en/products/docs/processors/xeon/xeon-scalable-platform-where-to-buy.html.

[29] *E.g.*,

https://www.intel.com/content/www/us/en/partner-alliance/membership/benefits/partners-ai.html.

selling, offering for sale, and/or importing one or more of the Accused Products, in violation of 35 U.S.C. § 271(a).

66.    As a consequence of Intel's infringement of the '621 patent, ACS has been damaged and is entitled to monetary relief in an amount to be determined at trial.

67.    Unless enjoined, Intel and/or others acting on behalf of Intel will continue their infringing acts, thereby causing additional irreparable injury to ACS for which there is no adequate remedy at law.

68.    ACS reserves the right to amend or supplement the initial infringement contentions set forth herein and in Exhibits G1 and G2, including the list of Accused Products, based upon further discovery. Further, ACS may amend or supplement any of its infringement contentions in view of any claim construction ruling(s) by the Court or any position taken by any party in this or any other related action. ACS therefore expressly reserves the right to amend or to supplement its identification of asserted claims and Accused Products, as well as its claim charts, based on further investigation and discovery.

### THIRD CLAIM FOR RELIEF
#### INFRINGEMENT OF THE '034 PATENT

69.    ACS realleges and reincorporates by references the allegations set forth in paragraphs 1-50 of this Complaint.

70.    ACS is informed and believes, and thereon alleges that Intel has directly infringed and continues to infringe, literally and/or through the doctrine of equivalents, at least one claim of the '034 patent by making, using, selling, offering for sale, and/or importing one or more of the Accused Products, in violation of 35 U.S.C. § 271(a).  Intel continues to engage in acts of direct infringement of the '034 patent.

71.    Exhibit H1 provides a claim chart demonstrating how the Accused Habana Server Products and Accused Habana AI Accelerator Products practice claim 1 of the '034 patent.  Exhibit H2 provides a claim chart demonstrating how the Accused Xeon Products practice claim 1 of the '034 patent.  Exhibit H3 provides a claim chart demonstrating how the Accused Habana AI Accelerator Products are configured in a manner that practices claim 30 of the '034 patent.  Exhibit H4 provides a claim chart demonstrating how the Accused Xeon Products are configured in a manner that practices claim 30 of the '034 patent.

72.    Intel is aware of the '034 patent and the infringement of the '034 patent by the Accused Products at least as of the filing date of this Complaint.  To the extent that Intel continues to infringe the '034 patent after the filing of this Complaint, it does so in willful disregard of ACS's patent rights.  Intel's continued infringement of the '034 patent is deliberate and willful, entitling ACS to an award of treble damages, reasonable attorney fees, and costs in bringing this action.

73.    ACS is informed and believes, and thereon alleges that, at least as of the filing date of this Complaint, Intel has actively, knowingly, and intentionally induced infringement of at least claims 1 and 30 of the '034 patent in violation of 35 U.S.C. § 271(b).  ACS is informed and believes, and thereon alleges that Intel makes, uses, sells, offers for sale, and/or imports one or more of the Accused Products for or on behalf of third parties such as customers, users, system builders, partners, and retailers/distributors, knowing and intending that the Accused Products will be used by the third parties in a manner that practices at least claims 1 and 30 of the '034 patent as shown in Exhibits H1, H2, H3 and H4.  For example, Intel published and provided marketing materials, technical specifications, whitepapers, datasheets, user manuals, and development and testing information, and other resources on its website (http://www.intel.com/) that instructed and encouraged third parties to integrate the Accused Products into products using Intel's technology

that were then made, used, sold, offered for sale and/or imported into the United States.[30]  Intel

has also established the "Intel AI Partner ecosystem" to assist customers with training, professional

services, and service and support.[31]  These activities were designed to bring infringing products

that incorporate Intel's Accused Products to market in the United States.  As a result of Intel's

activities, the Accused Products have been used in a manner that directly infringes the '034 patent.

Intel continues to engage in acts of inducement of infringement of the '034 patent.

74.    ACS is informed and believes, and thereon alleges that Intel has directly infringed

literally and/or through the doctrine of equivalents claims 1 and 30 of the '034 patent by making,

using, selling, offering for sale, and/or importing one or more of the Accused Products, in violation

of 35 U.S.C. § 271(a).

75.    As a consequence of Intel's infringement of the '034 patent, ACS has been

damaged and is entitled to monetary relief in an amount to be determined at trial.

76.    Unless enjoined, Intel and/or others acting on behalf of Intel will continue their

infringing acts, thereby causing additional irreparable injury to ACS for which there is no adequate

remedy at law.

77.    ACS reserves the right to amend or supplement the initial infringement contentions

set forth herein and in Exhibits H1, H2, H3, and H4, including the list of Accused Products, based

upon further discovery.  Further, ACS may amend or supplement any of its infringement

contentions in view of any claim construction ruling(s) by the Court or any position taken by any

---

[30] *E.g.*, https://www.intel.com/content/www/us/en/products/details/processors/ai-accelerators/gaudi-overview.html;
https://www.intel.com/content/www/us/en/products/docs/processors/xeon/xeon-scalable-platform-where-to-buy.html.

[31] *E.g.*,

https://www.intel.com/content/www/us/en/partner-alliance/membership/benefits/partners-ai.html.

party in this or any other related action. ACS therefore expressly reserves the right to amend or to supplement its identification of asserted claims and Accused Products, as well as its claim charts, based on further investigation and discovery.

### FOURTH CLAIM FOR RELIEF
#### INFRINGEMENT OF THE '582 PATENT

78.     ACS realleges and reincorporates by references the allegations set forth in paragraphs 1-50 of this Complaint.

79.     ACS is informed and believes, and thereon alleges that Intel has directly infringed and continues to infringe, literally and/or through the doctrine of equivalents, at least one claim of the '582 patent by making, using, selling, offering for sale, and/or importing one or more of the Accused Products, in violation of 35 U.S.C. § 271(a).  Intel continues to engage in acts of direct infringement of the '582 patent.

80.     Exhibit I1 provides a  claim chart demonstrating how the Accused Habana Server Products and Accused Habana AI Accelerator Products practice claim 1 of the '582 patent.  Exhibit I2 provides a claim chart demonstrating how the Accused Xeon Products are configured in a manner that practices claim 1 of the '582 patent.

81.     Intel is aware of the '582 patent and the infringement of the '582 patent by the Accused Products at least as of the filing date of this Complaint.  To the extent that Intel continues to infringe the '582 patent after the filing of this Complaint, it does so in willful disregard of ACS's patent rights.  Intel's continued infringement of the '582 patent is deliberate and willful, entitling ACS to an award of treble damages, reasonable attorney fees, and costs in bringing this action.

82.     ACS is informed and believes, and thereon alleges that, at least as of the filing date of this Complaint, Intel has actively, knowingly, and intentionally induced infringement of at least claim 1 of the '582 patent in violation of 35 U.S.C. § 271(b).  ACS is informed and believes, and

thereon alleges that Intel makes, uses, sells, offers for sale, and/or imports one or more of the Accused Products for or on behalf of third parties such as customers, users, system builders, partners, and retailers/distributors, knowing and intending that the Accused Products will be used by the third parties in a manner that practices at least claim 1 of the '582 patent as shown in Exhibits I1 and I2. For example, Intel published and provided marketing materials, technical specifications, whitepapers, datasheets, user manuals, and development and testing information, and other resources on its website (http://www.intel.com/) that instructed and encouraged third parties to integrate the Accused Products into products using Intel's technology that were then made, used, sold, offered for sale and/or imported into the United States.[32] Intel has also established the "Intel AI Partner ecosystem" to assist customers with training, professional services, and service and support.[33] These activities were designed to bring infringing products that incorporate Intel's Accused Products to market in the United States. As a result of Intel's activities, the Accused \ Products have been used in a manner that directly infringes the '582 patent. Intel continues to engage in acts of inducement of infringement of the '582 patent.

83.    ACS is informed and believes, and thereon alleges that Intel has directly infringed literally and/or through the doctrine of equivalents claim 1 of the '582 patent by making, using, selling, offering for sale, and/or importing one or more of the Accused Products, in violation of 35 U.S.C. § 271(a).

---

[32] *E.g.*, https://www.intel.com/content/www/us/en/products/details/processors/ai-accelerators/gaudi-overview.html; https://www.intel.com/content/www/us/en/products/docs/processors/xeon/xeon-scalable-platform-where-to-buy.html.

[33] *E.g.*,

https://www.intel.com/content/www/us/en/partner-alliance/membership/benefits/partners-ai.html.

84.     As a consequence of Intel's infringement of the '582 patent, ACS has been damaged and is entitled to monetary relief in an amount to be determined at trial.

85.     Unless enjoined, Intel and/or others acting on behalf of Intel will continue their infringing acts, thereby causing additional irreparable injury to ACS for which there is no adequate remedy at law.

86.     ACS reserves the right to amend or supplement the initial infringement contentions set forth herein and in Exhibits I1 and I2, including the list of Accused Products, based upon further discovery. Further, ACS may amend or supplement any of its infringement contentions in view of any claim construction ruling(s) by the Court or any position taken by any party in this or any other related action. ACS therefore expressly reserves the right to amend or to supplement its identification of asserted claims and Accused Products, as well as its claim charts, based on further investigation and discovery.

## FIFTH CLAIM FOR RELIEF
### INFRINGEMENT OF THE '679 PATENT

87.     ACS realleges and reincorporates by references the allegations set forth in paragraphs 1-50 of this Complaint.

88.     ACS is informed and believes, and thereon alleges that Intel has directly infringed and continues to infringe, literally and/or through the doctrine of equivalents, at least one claim of the '679 patent by making, using, selling, offering for sale, and/or importing one or more of the Accused Products, in violation of 35 U.S.C. § 271(a).  Intel continues to engage in acts of direct infringement of the '679 patent.

89.     Exhibit J1 provides a claim chart demonstrating how the Accused Habana Server Products and Accused Habana AI Accelerator Products practice claim 1 of the '679 patent.  Exhibit

J2 provides a claim chart demonstrating how the Accused Xeon Products practice claim 1 of the '679 patent.

90.    Intel is aware of the '679 patent and the infringement of the '679 patent by the Accused Products at least as of the filing date of this Complaint.  To the extent that Intel continues to infringe the '679 patent after the filing of this Complaint, it does so in willful disregard of ACS's patent rights.  Intel's continued infringement of the '768 patent is deliberate and willful, entitling ACS to an award of treble damages, reasonable attorney fees, and costs in bringing this action.

91.    ACS is informed and believes, and thereon alleges that, at least as of the filing date of this Complaint, Intel has actively, knowingly, and intentionally induced infringement of at least claim 1 of the '679 patent in violation of 35 U.S.C. § 271(b).  ACS is informed and believes, and thereon alleges that Intel makes, uses, sells, offers for sale, and/or imports one or more of the Accused Products for or on behalf of third parties such as customers, users, system builders, partners, and retailers/distributors, knowing and intending that the Accused Products will be used by the third parties in a manner that practices at least claim 1 of the '679 patent as shown in Exhibits J1 and J2.  For example, Intel published and provided marketing materials, technical specifications, whitepapers, datasheets, user manuals, and development and testing information, and other resources on its website (http://www.intel.com/) that instructed and encouraged third parties to integrate the Accused Products into products using Intel's technology that were then made, used, sold, offered for sale and/or imported into the United States. [34]  Intel has also established the "Intel AI Partner ecosystem" to assist customers with training, professional services, and service and

---

[34] *E.g.*, https://www.intel.com/content/www/us/en/products/details/processors/ai-accelerators/gaudi-overview.html;
https://www.intel.com/content/www/us/en/products/docs/processors/xeon/xeon-scalable-platform-where-to-buy.html.

support.[35]   These activities were designed to bring infringing products that incorporate Intel's Accused Products to market in the United States.  As a result of Intel's activities, the Accused Products have been used in a manner that directly infringes the '679 patent.  Intel continues to engage in acts inducement of infringement of the '679 patent.

92.    ACS is informed and believes, and thereon alleges that Intel has directly infringed literally and/or through the doctrine of equivalents claim 1 of the '679 patent by making, using, selling, offering for sale, and/or importing one or more of the Accused Products, in violation of 35 U.S.C. § 271(a).

93.    As a consequence of Intel's infringement of the '679 patent, ACS has been damaged and is entitled to monetary relief in an amount to be determined at trial.

94.    Unless enjoined, Intel and/or others acting on behalf of Intel will continue their infringing acts, thereby causing additional irreparable injury to ACS for which there is no adequate remedy at law.

95.    ACS reserves the right to amend or supplement the initial infringement contentions set forth herein and in Exhibits J1 and J2, including the list of Accused Products, based upon further discovery. Further, ACS may amend or supplement any of its infringement contentions in view of any claim construction ruling(s) by the Court or any position taken by any party in this or any other related action. ACS therefore expressly reserves the right to amend or to supplement its identification of asserted claims and Accused Products, as well as its claim charts, based on further investigation and discovery.

---

[35] *E.g.*,

https://www.intel.com/content/www/us/en/partner-alliance/membership/benefits/partners-ai.html.

## PRAYER FOR RELIEF

**WHEREFORE**, ACS prays for judgment in its favor against Intel for the following relief:

A.      Pursuant to 35 U.S.C. § 271, a determination that Intel and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them have infringed, directly and indirectly, each of the '768, '621, '034, '582, and '679 patents through the manufacture, use, importation, offer for sale, and/or sale of infringing products and/or any of the other acts prohibited by 35 U.S.C. § 271;

B.      Pursuant to 35 U.S.C. § 283, an injunction enjoining Intel and its officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them from further infringing the '768, '621, '034, '582, and '679 patents through the manufacture, use, sale, offer for sale, importation and/or any of the other acts prohibited by 35 U.S.C. § 271, including preliminary and permanent injunctive relief;

C.      Pursuant to 35 U.S.C. § 284, an award compensating ACS for Intel's infringement of the '768, '621, '034, '582, and '679 patents through payment of not less than a reasonable royalty on Intel's sales of infringing products;

D.      A judgment and order finding that Intel's acts of infringement were egregious and willful and trebling damages under 35 U.S.C. § 284;

E.      Pursuant to 35 U.S.C. § 285, a finding that this is an exceptional case, and an award of reasonable attorneys' fees and non-taxable costs;

F.      An assessment of prejudgment and post-judgment interest and costs against Intel, together with an award of such interest and costs, pursuant to 35 U.S.C. § 284;

G.      That this Court award such other and further relief as this Court may deem just.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), ACS hereby demands a trial by jury of all issues so triable.

Dated: September 26, 2024

Respectfully submitted,

*/s/ William D. Ellerman*

Jon Gurka (*pro hac vice* to be filed)
jgurka@crowell.com
CROWELL & MORING LLP
3 Park Plaza
20th Floor
Irvine, CA 92614
Telephone: (949) 798-1331

Reynaldo C. Barceló (*pro hac vice* to be filed)
rey@bhiplaw.com
BARCELÓ, HARRISON & WALKER, LLP
2901 West Coast Hwy, Suite 200
Newport Beach, CA 92663
Telephone: (949) 340-9736

Mark D. Siegmund (TX Bar No. 24117055)
msiegmund@cjsjlaw.com
William D. Ellerman (TX Bar No. 24007151)
wellerman@cjsjlaw.com
CHERRY JOHNSON SIEGMUND JAMES, PLLC
7901 Fish Pond Rd., 2nd Floor
Waco, TX 76710
Telephone: (254) 732-2242

*Attorneys for Plaintiff*
*Advanced Cluster Systems, Inc.*